607 So.2d 1080 (1992)
Debra SIMMONS on Behalf of Her Minor Child Catlin SIMMONS, Plaintiff-Appellee,
v.
STATE FARM FIRE AND CASUALTY INSURANCE COMPANY, et al., Defendants-Appellants.
No. 91-729.
Court of Appeal of Louisiana, Third Circuit.
November 4, 1992.
Laborde & Lafargue, Maxwell J. Bordelon, Marksville, for plaintiff-appellee.
McLure & Pickels, James B. Reichman, Alexandria, for defendant-appellant.
*1081 Before STOKER, YELVERTON and COREIL[*], JJ.
STOKER, Judge.
This is a suit to recover personal injury damages under a rental dwelling policy. On September 20, 1988, Mr. Ivy Normand left a loaded pistol on the footrest of his riding lawnmower. The lawnmower was located on the carport of the house in which he was living as usufructuary. Catlin Simmons, who was four years old at the time, lived with his mother next door to Mr. Normand. Catlin went to the house where Mr. Normand was living and found the gun. Catlin then brought the gun to the house where he was living. While playing with the gun, Catlin shot himself in the hand.
Prior to the accident, Mr. Normand and his wife had donated their house to their daughter, Ms. Margie Drewett, retaining the usufruct of the property until their deaths. Ms. Drewett had taken out insurance on the house and was the named insured under the policy. The policy was entitled "RENTAL DWELLING POLICYSPECIAL FORM 3."
Ms. Debra Simmons, individually and on behalf of her minor son, Catlin, filed suit against Mr. Normand and State Farm Fire & Casualty Company which had issued the rental dwelling policy to Ms. Drewett. As the trial court noted, the key question at trial was one of policy coverage. Since Mr. Normand was not specifically designated as the named insured under the policy, the policy did not provide liability coverage for any tortious acts that he may have committed unless he otherwise fit the definition of an "insured." Ms. Simmons contended that Mr. Normand was an "insured" based on the following definition of an insured under the policy: "e. any person or organization while acting as a real estate manager for the named insured." (Emphasis added).
State Farm disagreed with Ms. Simmon's position and sought resolution of the coverage issue through a motion for summary judgment. The trial court denied the motion. The case was then tried on its merits.
The trial court found that Mr. Normand was negligent and that his negligence was a cause in fact of Catlin's injury. The court awarded Ms. Simmons $8000 on behalf of Catlin and $4000 for her own mental anguish. The court also found that Mr. Normand was a "real estate manager" as contemplated by the policy. In finding coverage, the trial court stated the following:
"... Ms. Drewett's parents, Mr. and Mrs. Normand, had donated their home to Ms. Drewett and retained the use of the home until their death. The Normands had also donated other properties to their children. It was admitted that this donation was done in anticipation, eventually, of the death of the Normands. They wanted their children to get certain items of property and decided to donate the property while still alive. These actions are common in this area as a method of avoidance of successions.
"Mr. Normand, Ms. Drewett's father, not only continued to live in the house donated to Ms. Drewett, but also acted as an overseer of Ms. Drewett's house as well as the properties of his other children that he and his wife had donated. Ms. Drewett had taken out insurance on her premises and was the named beneficiary of the casualty policies.
"The case at bar involves a young child who picked up a gun that Mr. Normand had intended to use in shooting dogs on the property in question. The child brought the gun to the home he was living in with his mother and shot himself in the hand. The mother came to her son's aid and rushed him to the hospital.
"The key question is one of coverage. The parties agree that, if Mr. Normand was a `Real Estate Manager' for Ms. Drewett, there is coverage under the policy. If he was not a `Real Estate Manager' then there is no coverage.

*1082 "The cases cited by defense counsel have a common thread running through them. In each of the cases cited, the person whose status was being determined, was taking actions on or towards the property in question for his own immediate benefit rather than the benefit of the property or its owner. Any benefit to the property or to its owner was secondary to the benefit being reaped by the person acting.
"In the case at bar, it is obvious that Mr. and Mrs. Normand intended that their children get certain items of property upon the parent's death. Mr. Normand continued overseeing the various parcels of property, not for his own benefit or gratification, but to insure that the properties, at his death, would pass on to his children in the best possible condition. His ultimate goal was the benefitting of his children proprietary interests. The defendant's arguments that this house was, in reality, still her parents is not consistent with the fact that, had the home burned, Ms. Drewett, and not her parents, would have benefitted monetarily. Likewise, the ultimate result of Mr. Normand's overseeing efforts was to benefit his daughter when she ultimately joined her naked ownership with the usufruct of the home after the Normand's death. For these reasons, the court finds that Mr. Normand was a property manager as contemplated by the policy and that, therefore, there was coverage..."
State Farm appealed specifying six issues for our review. Since we reverse the trial court's finding of coverage we will not address the other issues as they are moot concerning State Farm.
In Savoy v. Action Products Company, Inc., 324 So.2d 921, 923 (La.App. 3d Cir.1975), writ denied, 329 So.2d 463 (La. 1976), this court stated that "a `real estate manager' is simply one who manages real estate for another. A manager is one who `conducts, directs or supervises something', Websters 3d International Dict. 1372 (3rd Ed.1966). He is a person who has the conduct or direction of a thing. People v. Boyden, 7 Ill.App.2d 87, 129 N.E.2d 37 (1955)." We also stated that the definition of a real estate manager is a question of law, whereas whether an individual is included within that definition is a question of fact.
As set forth above, the trial court based its holding that Mr. Normand was a "real estate manager" for Ms. Drewett on the premise that Mr. Normand was "overseeing" the property donated to Ms. Drewett not for his own benefit but for the benefit of Ms. Drewett, thus distinguishing the case at hand from "[t]he cases cited by defense counsel." We assume that the cases referred to by the trial court are Savoy, supra, and Jackson v. East Baton Rouge Parish School Board, 348 So.2d 739 (La.App. 1st Cir.1977), which were cited in State Farm's memorandum in support of its motion for summary judgment.
In Savoy, supra, the plaintiff filed suit for personal injury damages sustained in a restaurant when the chair in which the plaintiff was sitting collapsed. Among the defendants named were the lessors-owners of the restaurant, their insurer, and the lessees-operators of the restaurant. The sole issue on appeal was whether the trial court properly dismissed the insurer on a motion for summary judgment. The insurance policy provided that any person while acting as a real estate manager for the named insured was an insured for purposes of liability coverage. The plaintiff urged that one of the lessees was a named insured under the policy because she was a "real estate manager" for the lessors. In concluding that the evidence showed that the lessee was not a real estate manager, we stated:
"While a real estate manager may also be a lessee, not all lessees are real estate managers. It is true that a lessee possesses for his lessor and not for himself. LSA-C.C. Article 3441; State, through Department of Highways v. Moity, 276 So.2d 770 (La.App. 3rd Cir.1973). It is likewise true that the lessee must act as a good administrator of his lessor's property, LSA-C.C. Articles 2710 and 2719. And the Louisiana Civil Code provides *1083 that certain repairs must be made by the lessee, and that the lessee may call upon the lessor to make certain others. LSA-C.C. Articles 2693, 2694 and 2695. But though a person who performs these acts may be said to have the `conduct or direction of a thing', he does not as a result of that performance become a real estate manager, for these acts are merely affirmative duties required of every lessee.
While the definition of real estate manager, as we stated earlier, is a question of law, whether in this case Mrs. Higginbotham is included within that definition is a question of fact. We conclude that Mrs. Higginbotham was a mere lessee and not a real estate manager. All of the acts performed by her in connection with the property leased were simply acts consistent with her obligations under the law of lease. She had no relationship with Sentry's insured other than as lessee of the property. The evidence considered by the trial court on the motion for summary judgment shows clearly that Mrs. Higginbotham was not a `real estate manager'. Thus, there was no `genuine issue of material fact' as to this question."
Savoy, supra at 924.
The court in Jackson v. East Baton Rouge Parish School Board, supra, held that the Department of Public Safety, which housed the Driver's License Renewal Facility in a building owned by the School Board, was not a real estate manager for purposes of liability coverage under the School Board's insurance policy. The court stated that "though the Department of Public Safety managed the real estate in question in some manner, it did so to serve its own purposes and not acting as a real estate manager for the named insured, the East Baton Rouge Parish School Board. At most, the Department of Public Safety was a lessee of the School Board." (Emphasis added) at page 741.
We find that the trial court erred in holding that Mr. Normand was acting as a real estate manager for Ms. Drewett.
Unlike the lessee situation discussed by us in Savoy, in legal theory we doubt that a usufructuary can ever be equated to the position of a real estate manager. We could perhaps rest our reversal of the trial court on this proposition. In any event, the facts of this case do not bring Mr. Normand within the definition of a real estate manager, and the trial court was clearly wrong in concluding otherwise. Although it may be superfluous to consider the facts, we will do so for the purpose of erasing any doubt about the matter.
The record is void of evidence to support the conclusion that Mr. Normand "managed" the property for Ms. Drewett. Furthermore, Ms. Drewett testified in deposition that it was not her intention that her parents should benefit from the liability coverage under the rental dwelling policy.
Mr. Normand had passed away at the time of trial. For reasons not revealed by the record, Mrs. Normand was not called to testify.
Ms. Drewett testified that in 1977 her father donated all of his property to his children in lieu of making a will. She stated that Mr. and Mrs. Normand donated the house in which they were living to her and retained the usufruct until their deaths. She testified as follows:
"A ...
But like my house, the house I got, the homeplace, it's different, because they retained usufruct of the house. And it was all set according to their rules. They wanted things just like they were, you know, no change. That's just the way it was.
BY THE COURT:
I understand. It was changed, as far as you and your father's concerned, it was a paper change, only.
A. That's all."
Ms. Drewett testified concerning maintenance, repairs, decisions, and costs affecting the property.
In response to questions by plaintiff's counsel she testifies as follows:
"Q. So your parents continue to keep up the house that they're in right now, and make repairs to it, correct?
*1084 A. They continued to do everything they had previously done.
Q. OK, so they made the repairs and so forth?
A. Yes.
Q. OK, you wouldn't make those repairs?
A. Not at all.
Q. OK. As a matter of fact, they had just re-roofed the house, I think?
A. Yes. They had. This was the way they wanted to do it."
* * * * * *
In response to questions by defendant's counsel Ms. Drewett testified as follows:
"Q. Now, you had testified that this was on their terms, or, at least the acquisition of the house by you, I would assume, is what you're referring to.
A. Yes.
Q. What do you mean by that?
A. Well, that they would continue on as before, as they continued the up-keep of the house, any problems that went wrong with it; they were responsible for it. And this was the way they wanted it.
Q. OK. Let me ask you some specific questions about that: Did your parents ever pay you any rent to stay in this house?
A. No, they did not. Q. Did you have any discussions with them, whatsoever, about them living in the house and looking after the house in lieu of paying rent?
A. No.
Q. Did you have a key to this house?
A. No.
Q. Who maintained the yard?
A. They did, but I think they got my nephew to cut the grass for them. They paid my nephew.
Q. Did you ever get any bills for yard work?
A. No.
Q. If the house needed something like painting, or, say a window got broken, and it needed fixing, who tended to that?
A. They did.
Q. Did you ever get any bills for that?
A. No.
Q. If your parents wanted to re-roof the house, or remodel the house, was it necessary that they got your consent in advance?
A. No. I mean, they might have discussed it with me, but they had already made the decision to do it. They would do it."
"Q. If a contract were entered into with a builder or with some type of roofer or something like that, do you know of any such contract ever having been entered into in your name?
A. No.
Q. Did you ever receive any bills for any work such as that?
A. No.
Q. If work was done, of that nature, who would pay for it?
A. They did.
Q. Have you ever reimbursed your parents for any repairs or maintenance items that were ever done on this house?
A. No.
Q. Did you ever have any agreement with your parents that if they did something on the property, such as build a building, an out building, or something like that, if they would have to leave it there, anything they did benefitted you?
A. No ...
Q. The answer is ...
A. I don't know if I'm understanding what you're saying.
Q. OK. Did you ever tell your parents, if y'all do something to this house, or make an addition to this house, you have to leave it when you go? You can't take it with you?
A. No. No.
Q. Who pays the utility bills on that house?
A. My mother does.
Q. Under whose name are the utilities turned on?
A. They're in her name.
Q. Is the reason for this because that was the reason that they wanted it?
A. That's right; yes.
*1085 Q. Whose house did you consider this as being?
A. Their house.
Q. Tell me why?
A. Because it was just donated to me on paper, only; it was their house; they built it; they've lived in it; and they had usufruct of it until their death."
The usufructuary is responsible for ordinary maintenance and repairs, while the naked owner is responsible for extraordinary repairs which are those repairs for the reconstruction of the whole or of a substantial part of the property subject to the usufruct. LSA-C.C. arts. 577 and 578. The only arguable extraordinary repair made by the Normands which is set forth in the record is the re-roofing of the house. The record reveals that the maintenance and repairs made by the Normands were those required of all usufructuaries. Simply because the Normands discharged their obligations of maintenance and repair does not give rise to the conclusion that they managed the property for Ms. Drewett.
We have found no evidence that Ms. Drewett was consulted or that her desires or interests were considered in the management of the property. Moreover, Ms. Drewett testified that the house was considered her parents' house, and that the donation was only a "paper change" of ownership. The evidence simply does not suggest that the Normands managed the property for Ms. Drewett in preference to or in addition to managing the property for themselves.
The only evidence arguably indicating that Mr. and Mrs. Normand were managing the property for Ms. Drewett is the fact that she is their daughter and the inference arising from that fact that, as her parents, Mr. and Mrs. Normand would want to give the property to Ms. Drewett at the termination of the usufruct in the best condition possible.
However, the Louisiana Supreme Court in Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), explained that the appellate review of facts is not completed by reading so much of the record as will reveal a factual basis for the finding in the trial court; there must be a further determination that the finding is not clearly wrong. We find a total absence of evidence that Mr. Normand did in fact manage the property for the benefit of Ms. Drewett. No justifiable inference that he did so can be drawn from the father-daughter relationship. Therefore, we find that the trial court was clearly wrong in finding that Mr. Normand was a real estate manager for Ms. Drewett.
Additionally, Ms. Drewett testified in deposition that she did not intend that the policy provide liability coverage for her parents.
Accordingly, we reverse that portion of the trial court's judgment which held that the State Farm policy provided liability coverage for Mr. Normand's negligent acts, and the plaintiffs' action against State Farm Fire and Casualty Insurance Company is dismissed. The costs of this appeal are assessed against the plaintiff-appellee, Ms. Simmons.
REVERSED in PART.
NOTES
[*] Honorable Joseph E. Coreil participated in this decision by appointment of the Louisiana State Supreme Court as Judge Pro Tempore.